ELIZABETH H. GRAY ET AL. *v.* JOHN J. HUDSON ET AL.

SUPERIOR COURT      FAIRFIELD COUNTY      FILE NO. 132663
AT BRIDGEPORT

Memorandum filed July 9, 1974

*Durey & Pierson,* for the substituted plaintiff James C. Fitter.

*Ivey, Barnum & O'Mara,* for the named defendant.

*Robert K. Killian,* attorney general, and *James J. Grady,* assistant attorney general, for the defendant state of Connecticut.

SADEN, J. This is an action for ejectment involving a peninsula comprising .62 acre of land

in Old Greenwich which is landlocked and bounded
on three sides, north, south and west, by the tidal
waters of Long Island Sound.[1]  There are no
buildings on the peninsula, but, from approximately
1948 to the present time, the defendant John J.
Hudson has resided in a vessel moored to the south-
erly side.  Hudson has occupied the peninsula since
then and has used it in conjunction with an upland
piece of land which he has owned bounded on Shore
Road.  This upland piece was some time in the past
in part extended by reclamation along the westerly
boundary thereof.

The state of Connecticut, a party to the suit, dis-
claims any interest or right to the land in dispute,
so that at present the effective plaintiff in the case,
by substitution, is James C. Fitter, and the sole
defendant to whom reference may be made here-
after is John J. Hudson.

I

This action was started in September, 1961, by
the executors of the estate of William W. Scofield.
On July 17, 1967, by quitclaim deed, the executors
conveyed all their right, title and interest to the
disputed property to James C. Fitter, and on Sep-
tember 22, 1967, he moved to be substituted as plain-
tiff in this action.  The motion was granted.  Thus
the sole party plaintiff is now James C. Fitter, the
grantee of the executors of William W. Scofield's
estate.  It is noted, of course, that the executors were
dropped as parties plaintiff upon substitution of

[1] "A certain parcel of land situated in the town of Greenwich,
county of Fairfield and state of Connecticut having an area of six-
tenths of an acre, more or less, and bounded and described as follows:

| | |
|---|---|
| Northerly | by the waters of Greenwich Cove; |
| Northeasterly | by land of Edward A. Huddock and land of John J. Hudson, each in part; |
| Easterly | by land of John J. Hudson; |
| Southerly and Westerly | by the waters of Greenwich Cove." |

their grantee as the party plaintiff. On this set of facts the parties are at issue under General Statutes § 47-21.[2]

The plaintiff concedes that as of October 27, 1949, the defendant was in wrongful possession of the disputed peninsula which he continued up to the time of the deed to the plaintiff in 1967. Both parties argue at length their respective interpretations of *Palmer* v. *Uhl,* 112 Conn. 125, on the question of the applicability of § 47-21, as well as *Loewenberg* v. *Wallace,* 147 Conn. 689; *Morehouse* v. *Wood,* 93 Conn. 113; and *Paton* v. *Robinson,* 81 Conn. 547. The language of *Palmer* (p. 127) perhaps best summarizes the Connecticut rule among modern cases, even though it actually is dictum. There can be little doubt that the purpose of § 47-21 is to codify the old common-law rule against champerty and maintenance, and normally a deed from a competent living grantor to a grantee is void if the grantor has been ousted of possession at the time of the conveyance. This would certainly bar the present claim by the plaintiff except for a decision in 1793 by the Connecticut Supreme Court in *Barney* v. *Cuttler,* 1 Root 489, 490, a case apparently overlooked by counsel on both sides in their otherwise elaborate, lengthy and well-organized briefs. *Barney* clearly provides that an executor's deed issued by order of the Probate Court is not within the scope of § 47-21. An executor is an officer of trust who acts by virtue of his power, and when he sells land under that power pursuant to the order of the Probate Court he is not within either the letter or reason of the statute. The plaintiff's deed

---

[2] "[General Statutes] Sec. 47-21. DEEDS OF LAND BY PERSONS OUSTED OF POSSESSION, VOID. Any conveyance or lease, for any term, of any building, land or tenement, of which the grantor or lessor is ousted by the entry and possession of another, unless made to the person in actual possession, shall be void."

in this case, if it can be sustained in the chain of title, is such a deed not affected by § 47-21, and the plaintiff can therefore sue.

## II

The next question is whether either party obtained title by deed. One claiming title to real property must rely on the strength of his own title, and not on the weakness of another's title. *Hurlburt* v. *Bussemey,* 101 Conn. 406, 410. The rule applies to both parties in this action, and the first aspect of the question is to ascertain whether the disputed peninsula existed above the mean high water mark in 1898.

## A

Both parties start their chains of title with the deed from one Booth to Ferris in 1886, the language of which described the property conveyed as "3 acres more or less." In 1898, Ferris subdivided the property into ten lots, shown on a recorded map, which contained 2.475 acres by survey. The plaintiff considers that significant as proving by inference that Ferris retained approximately .525 of an acre which is only .10 of an acre less than the size of the peninsula in dispute. Hence, says the plaintiff, Ferris did not subdivide all of his land but retained the peninsula in question for future disposition. While that argument is ingenious and plausible, the court finds it difficult to accept for several reasons. The language of the Booth deed to Ferris is broad and general and cannot be construed to be intended as an accurate measurement of the amount of land conveyed since it does not appear to have been based upon a survey. It was more likely a calculated guess or estimate by the grantor. Furthermore, it puzzles the court why, if any land remained to the west above the high water mark, the surveyor made no indication whatever on his

map of its existence. Other arguments offered by the plaintiff's counsel that the peninsula existed in 1898 or before display considerable ingenuity but not sufficient cogency to persuade the court of their validity.

About a week after Ferris filed his subdivision map in 1898 he conveyed to one Alphonse lots six, seven and eight on the map. It is the defendant's contention that the disputed peninsula was under the mean high water in 1898 and did not come into existence until late 1907 or 1908 by a landfill operation undertaken by one Scofield, the plaintiff's immediate predecessor in title, pursuant to a permit issued by the secretary of war on an application filed by Scofield in September, 1907. The defendant claims that, at the time of the conveyance by Ferris to Alphonse in 1898, the westerly boundary of the lots conveyed was the waters of Greenwich Cove as indicated by a blue line on Ferris' subdivision survey. Only after Scofield completed his landfill operation in 1908, claims the defendant, did the peninsula rise above the mean high water mark.

The court is confronted with the problem of determining what Ferris intended to do and what he actually accomplished by his deed to Alphonse in 1898 and later by his deed to Scofield in January, 1907. Needless to say, time always obscures the sharp outlines of all controversies, and to a large extent the court must rely wherever possible on reasonable inferences that may be drawn from such evidence as the parties have been able to offer. Nothing in the deed from Ferris to Alphonse in 1898 reserves or retains to the grantor any land to the west of the three lots conveyed. If land was there, as the plaintiff contends, one wonders why the deed was silent as to its retention by Ferris or at least as to the retention of a right of way to the unconveyed sliver of land now claimed to have existed

then. Compare *New Haven Steamboat Co.* v. *Sargent & Co.*, 50 Conn. 199, 203, 206. The warranty deed simply conveys the lots "with the appurtenances thereof" to the grantee. See *New Haven Steamboat Co.*, supra, pp. 203, 206, on "appurtenant."

Problems presented themselves concerning the location of the mean high water mark in 1898, and the court will not seek to elaborate the numerous contested points relating to a United States coast and geodetic map in evidence which was published in 1898 based on data gathered at least in part as early as 1834. But a point of some significance is the application by Scofield dated September 18, 1907, to the secretary of war for a permit to dredge a channel and build a bulkhead at Greenwich Cove, Connecticut. It contains a diagram for the work to be done and indicates that the proposed bulkhead and fill would extend beyond the mean high water mark for a distance of approximately 300 feet on its northerly side and 450 feet on its southerly side with an approximate width of 100 feet. The only live testimony concerning the facts as they were in 1907 came from the defendant, who was then a young boy. He testified that he remembered that the peninsula did not exist until Scofield began filling it in in December, 1907, and completing it in the summer of 1908.

Scofield, from whose estate the plaintiff acquired his title by quitclaim deed in 1967, originally obtained from Ferris a quitclaim deed dated January 3, 1907, and recorded January 8, 1907. It described what it purported to convey as follows:

"[A]ll that certain tract, piece or parcel of land situated at South Beach . . . bounded north by land of John W. Shea and Catherine F. Shea; east by land of John W. Alphonse; south by land of Frederick Topping and west by the Little Cove so called.

"It is the intention of the Releasor to convey all the land with all his Riparian rights between the west boundary line of the land of John W. Alphonse and the channel to the westward thereof."

An examination of an aerial map of the peninsula and surrounding areas, made in recent years by the Greenwich tax assessor, showing the approximate locations and sizes of the Ferris subdivision map of 1898, the peninsula and the waters of the cove, tends to establish that the southerly boundary line described as land of Topping simply did not exist in 1907. (Topping had previously acquired lots one through five from Ferris in 1900.) This is because Alphonse's lot six and Topping's lot five had a common boundary and no other land appears on the map or the aerial survey which could possibly abut Topping's lot five as the southerly boundary described in the Ferris-to-Scofield 1907 deed. It is true, of course, that a statement signed by Scofield at some unspecified time in the past purported to explain what Ferris was conveying to Scofield by his quitclaim deed of 1907. But the key to the problem is not what Ferris thought he was conveying in January, 1907, to Scofield; it is what Ferris intended to convey in 1898 to Alphonse as he expressed it then in his deed to him. For whatever Ferris may have later thought he owned to the west of the Alphonse lots, if there is no evidence to establish Ferris' intention to retain land to the west or to establish that there actually was any land to the west of those lots in 1898 at the time of the conveyance to Alphonse, it becomes a futile exercise to discuss events occurring after 1898 with regard to title to the peninsula as shown by the Scofield deed.

In this connection the plaintiff concedes that the defendant reclaimed a portion of lot six shown in

the above-mentioned assessor's aerial map. It is the portion contained to the west of the V-shaped white line that juts into the west boundary of lot six. Since this is undisputed, it further establishes that prior to the defendant's reclamation of that portion of land, there could have been no common boundary of any kind between the southerly boundary described in the Ferris-to-Scofield 1907 deed and the northerly boundary of Topping's lot five. Moreover, this undisputed fact further casts serious doubt upon the credibility of Scofield's undated and self-serving statement which claims that an eight-to-ten-foot wide strip of land existed in 1907 beyond the west boundary of lots six, seven and eight in the Ferris-to-Alphonse deed of 1898. At least insofar as lot six is concerned, that would have been inaccurate if it is conceded that the defendant had reclaimed the same area west of the westerly line of lot six. Compared to Scofield's statement is the defendant's exhibit consisting of a blueprint map which the defendant himself prepared in 1960 just before the inception of this action. This map indicates that the entire area west of the west boundaries of lots six and seven was a reclaimed mud wharf. It, too, is a self-serving declaration. It is interesting, however, to observe that this mud wharf has as much if not more contact with lot seven as it does with the reclaimed portion of lot six.

Against Scofield's undated written purported explanation of what his 1907 deed from Ferris contained, there is the fact previously mentioned that if eight to ten feet of land existed, as Scofield claims, to the west of Alphonse's lots six, seven and eight, why did not Ferris have his surveyor show it in some fashion on his subdivision map. The map obviously was made to sell land. The piece of land Scofield describes was salable, although it would have had questionable value with-

out access to a public highway inland except over the land of strangers. But see *New Haven Steamboat Co.* v. *Sargent & Co.,* 50 Conn. 199, 203, 206.

The court does not find that the plaintiff has sustained his burden of proof that the Ferris-to-Scofield 1907 deed conveyed title to the disputed land as existing land at and prior to the time of conveyance. The court must therefore find that the area west of the westerly boundaries of at least lots six and seven in the Ferris-to-Alphonse deed of 1898 was below the mean high water mark. The court also finds that while the 1907 Scofield deed purports to convey land and riparian rights west of the Alphonse lots conveyed in 1898, it was not the intention of the grantor Ferris in 1898 to reserve or retain any interest in the area west of the lots he then conveyed to Alphonse. The issue comes down in the final analysis to a matter of credibility of the evidence offered on this important contested point, keeping in mind reasonable inferences that can be drawn and the status of the burden of proof. No doubt, Ferris, in 1898, could have separately alienated his franchises in the water and submerged land adjoining his upland; *State* v. *Knowles-Lombard Co.,* 122 Conn. 263, 265; but the conveyance of upland bordering upon the mean high water mark presumptively carries with it the riparian rights attached thereto, including privileges of reclamation and wharfing out. See *Barri* v. *Schwarz Bros. Co.,* 93 Conn. 501, 507. Without such severance of riparian rights in 1898 by Ferris, his grantee, Alphonse, obtained them with lots six, seven and eight. Thereafter Ferris no longer had any such rights to convey, whether by warranty or quitclaim deed, and his 1907 quitclaim deed to Scofield conveyed nothing in the absence of any upland. This deed, significantly, purported to convey not merely any severed riparian rights, but

*"land* with all his Riparian rights" west of the Alphonse lots. (Emphasis added.) It leaves open to question whether in actuality this was an attempted severance of riparian rights from lots six, seven and eight, since the deed purports to indicate there was land west of the lots.

## B

The court next turns to the question whether, if the peninsula was below mean high water in 1898, the plaintiff nevertheless acquired title by deed.

The Ferris-to-Scofield deed dated January 3, 1907, was a quitclaim of "land with all . . . the [grantor's] Riparian rights" west of the Alphonse lots. Twelve days later on January 15, Scofield bought from Alphonse lots six, seven and eight that Alphonse had previously purchased in 1898 from Ferris, and Alphonse took back a purchase money second mortgage upon the same land. Alphonse's deed to Scofield describes the premises as "being the same premises conveyed to me" by Ferris in 1898, together with "the privileges and appurtenances thereof." It has already been decided that the Ferris-to-Scofield deed of 1907 conveyed nothing, mainly because Ferris had in 1898 conveyed riparian rights presumptively to Alphonse in the deed to lots six, seven and eight on Ferris's map, and additionally because there was no land west of those lots then in existence except such as was under water which belonged to the state. *State* v. *Knowles-Lombard Co.,* 122 Conn. 263, 265.

Thus when Alphonse conveyed to Scofield in 1907 the same property he had received from Ferris in 1898, in the absence of any evidence to the contrary, it is presumed to include everything Alphonse had previously obtained. Simultaneously, Alphonse took back a purchase money second mortgage from

Scofield for the same property apparently without any mention by either side of the Ferris-to-Scofield deed given a week or so earlier, purportedly, to land and riparian rights west of the Alphonse lots. The plaintiff contends that this manifested an intention by Scofield not to include the rights obtained from Ferris by quitclaim deed, and that this secret intention of Scofield's established a severance of the latter rights from lots six, seven and eight. Here again is an ingenious but unpersuasive argument. Scofield received nothing by his 1907 deed from Ferris; but even assuming arguendo that he did, his secret intention would not control the scope of the mortgage lien. Alphonse was as much a party to the mortgage transaction as Scofield and he had conveyed all that he had. Naturally in taking back a mortgage, he had full right to expect all that had been conveyed to Scofield to be subject to the lien, absent anything to the contrary in the deed. Inasmuch as his deed to Scofield included riparian rights, such rights were subject to the mortgage lien. The actual intention of both parties must control as manifested in the deeds exchanged and the circumstances surrounding them. The secret intention of one party is not controlling. 59 C.J.S., Mortgages, § 182.

When the peninsula was reclaimed following the execution of the above mortgage, it became an integral part of the adjoining upland. *Lockwood v. New York & New Haven R. Co.,* 37 Conn. 387, 391. The line of the high water mark was changed thereby, and the owner's upland became enlarged just as when accession of soil occurs when the sea recedes. Such enlargement of the uplands itself becomes subject to the mortgage lien previously imposed upon the uplands by the owner. See *Gurevich v. Goldman,* 141 Conn. 281; *Chicago Dock & Canal Co. v. Kinzie,* 93 Ill. 415; 59 C.J.S., Mort-

gages, § 189; Thompson on Real Property (1958 Replacement) § 4703, p. 202. See also *People's Trust Co.* v. *Schenck,* 195 N.Y. 398.

Thereafter the Alphonse mortgage was foreclosed on lots six, seven and eight and title became absolute on December 22, 1914. Just prior to that on October 26, 1914, Scofield purportedly conveyed the disputed property by quitclaim deed to Hannah Scofield who in turn transferred it by quitclaim deed to one Gill on November 25, 1919, but this deed was not recorded until September 29, 1921. On September 27, 1921, Gill by quitclaim deed back to Scofield conveyed the same property, thus completing a full circle, purportedly returning it to Scofield. This series of quitclaim deeds, to say the least, leads the mind to much speculation as to their purposes, but the court does not draw any conclusions based on them.

### III

The court has now reached the point where the plaintiff has failed to prove Scofield's title by deed to the disputed peninsula. The next question is— did the defendant acquire title by deed?

It is observed that in 1916 the estate of John W. Alphonse conveyed lots six, seven and eight, the property he acquired by foreclosure, to Estella Kellogg, and she in turn conveyed the property to one June on the same day she obtained title from the Alphonse estate. Thereafter, in 1921, June conveyed lots seven, eight and the northerly portion of lot six to one Bladworth. Then in 1947 the estate of June by certificate of devise conveyed to Ethel Clarson of Florida the southerly portion of lot six, and on October 27, 1949, she in turn conveyed this portion to the defendant. In 1949 it would appear that the disputed peninsula was contiguous only with lot seven, although thereafter the defendant

apparently extended the westerly boundary of lot six through reclamation to reach the peninsula. But at no time did the defendant acquire any interest in lot seven. The defendant's only claim for title by deed necessarily would derive from June's conveyance to the defendant of the southerly portion of lot six, and clearly that is insufficient to establish such title in the defendant on such a basis.

## IV

The court passes over the question of whether the state had any interest in the disputed land either prior or subsequent to its coming into being by reclamation because the state at trial has disclaimed any such interest. Therefore the next question is whether the defendant obtained title by adverse possession. The burden of proof on this issue is upon the defendant, and it must be "clear and positive." *Wadsworth Realty Co.* v. *Sundberg,* 165 Conn. 457, 462; *Robinson* v. *Myers,* 156 Conn. 510, 517. The defendant must prove that the owner was ousted of possession and kept out uninterruptedly for fifteen years by the claimant under a claim of right, with intent to use the property as his own exclusively, and without license or consent of the owner. There are several reasons why the defendant has failed to establish adverse possession. One is the hiatus in possession following the death of June up to the time the defendant took possession, a period of approximately nine months. The defendant cannot therefore "tack on" June's alleged possession. Furthermore, whether June ever had actual, open and notorious possession of the peninsula is very questionable. Finally, no evidence was offered to establish that June ever occupied the peninsula, if he did, under any claim of right.

Remaining questions raised by the defendant concern the defense of laches and estoppel. As for

laches, the defendant must prove (1) that there was an inexcusable delay in advancing the claim against him and (2) that the delay prejudiced the defendant. *Paiva* v. *Vanech Heights Construction Co.*, 159 Conn. 512, 519. The court does not find that the defendant has sustained his burden of proof on this defense. The same is true of his claim of estoppel. The essential elements of estoppel can be summarized as follows: (1) the party sought to be estopped must do or say something intended or calculated to induce another to believe in the existence of certain facts and to act on that belief; (2) the other party, influenced thereby, must change his position or do some act to his injury which he otherwise would not have done; and (3) the other party must also exercise due diligence to ascertain the truth and establish that he not only lacked knowledge of the truth, but that he had no convenient means of acquiring it. *Mercanti* v. *Persson*, 160 Conn. 468, 477. The evidence is clear that the defendant has failed to meet this burden.

One last point in contention requires brief discussion. Both parties argue at some length in their briefs the applicability of the so-called Connecticut Marketable Title Act, General Statutes §§ 47-33b through 47-33*l*, each claiming support for his position from its language. Both, however, overlook the threshold question whether this act can under any circumstances be applied to this case. The present action was instituted in 1961. The substituted plaintiff acquired title by quitclaim deed in 1967. The Connecticut Marketable Title Act was originally enacted in 1967 to take effect on January 1, 1968. Inasmuch as it certainly affects substantive rights and cannot by any stretch of the imagination be classified as "procedural," the court holds that it does not apply to a pending action such as this. General Statutes § 1-1 (u) provides that "[t]he

passage . . . of an act shall not affect any action then pending." Furthermore, that proposition of law is clearly established in many decisions, among which the court cites only two: *Little* v. *Ives,* 158 Conn. 452, 457, and *Massa* v. *Nastri,* 125 Conn. 144, 146.

## V

In light of the foregoing the court must conclude that the plaintiff has not sustained his burden of proof on his substituted complaint dated February 15, 1973, and that he therefore cannot claim possession of the disputed premises described in paragraph one of the complaint. Similarly, the defendant has not sustained his burden of proof to establish title to the disputed property for the reasons set forth above in connection with the consideration of his special defenses as well as his counterclaim. The defendant's counterclaim asks for judgment (1) determining that the Ferris-to-Alphonse deed of 1898 conveyed to Alphonse everything that the Ferris-to-Scofield deed of 1907 purported to convey; (2) "settling the title"; and (3) determining the title to be in the defendant. The court has already passed upon the significance of the above-mentioned deeds and has also determined that the defendant has not sustained his burden of proof as to title under his counterclaim. The introduction of the claim to "settle title" serves only to confuse an already perplexing case and, insofar as both sides are concerned, can be treated as surplusage with no intention of converting this ejectment action into a quiet title action under General Statutes § 47-31. If it becomes the latter, then the parties are confronted with cases such as *Faiola* v. *Faiola,* 156 Conn. 12, 14; *Marquis* v. *Drost,* 155 Conn. 327, 330; and *Lake Garda Improvement Assn.* v. *Battistoni,* 155 Conn. 287, 293. The court is justified, moreover, in not treating this as a quiet

title action because the parties themselves in the trial and in their briefs have treated the case as strictly an action of ejectment in which each has placed his title in issue to establish his right to possession. On this basis, the court has found that neither party (the defendant having filed both special defenses and a counterclaim) has sustained his burden of proof as to his own title. See *Waterbury Trust Co.* v. *G.L.D. Realty Co.*, 121 Conn. 50, 53; *Hurlburt* v. *Bussemey*, 101 Conn. 406, 410. If the court were to treat this matter as an action to quiet title in the true sense, it would appear to be necessary to cite in other parties who might appear to have possible claims. See *Lake Garda Improvement Assn.* v. *Battistoni*, supra. The present decision will serve the limited objective of settling this long-running battle (since September, 1961) between these two sides.[3]

Judgment is ordered that neither the plaintiff on his substituted complaint nor the defendant on his counterclaim has established title to the disputed peninsula.

---

[3] The court compliments counsel on both sides for a thorough and well-organized presentation of their claims both at the trial and in their briefs. Weaknesses of proof on both sides obviously were no fault of theirs.